# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 27, 2010 Session

## STATE OF TENNESSEE v. PAUL WALLACE DINWIDDIE, JR.

### Appeal from the Criminal Court for Knox County
### No. 88542      Richard R. Baumgartner, Judge

---

### No. E2009-01752-CCA-R3-CD - Filed July 23, 2010

---

A Knox County jury convicted the defendant, Paul Wallace Dinwiddie, Jr., of two counts of aggravated rape and two counts of aggravated sexual battery. The defendant appeals, alleging that the trial court erred by instructing the jury on flight and by allowing a nurse practitioner to testify as an expert witness. The defendant also challenges the sufficiency of the convicting evidence and the length of his sentences. Upon our review, we find no error in the convictions; however, we remand to the trial court to merge the two aggravated sexual battery jury verdicts into one conviction judgment and the two aggravated rape jury verdicts into one conviction judgment.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part, Vacated in Part, Case Remanded

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and J.C. MCLIN, J., joined.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Paul Wallace Dinwiddie, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Introduction*

On October 23, 2006, an individual broke into the residence of the victim, L.

E.B.,[1] covered the victim's face with a towel, digitally penetrated her vagina, and placed her breasts in his mouth. Subsequent investigation resulted in the arrest of the defendant, and a Knox County grand jury indicted the defendant for two counts of aggravated rape, *see* T.C.A. § 39-13-502 (2006), and two counts of aggravated sexual battery, *see id.* § 39-13-504. After a two-day trial that ended on March 26, 2008, a Knox County jury convicted the defendant as charged on all counts. The trial court sentenced the defendant to 25 years' incarceration for the aggravated rape convictions to be served consecutively to 20 years' incarceration for the aggravated sexual battery convictions. The defendant filed a timely motion for new trial and notice of appeal.

*Trial*

The victim testified that she was 26 years old and had moved to Knoxville from Athens, Tennessee, in 2004 to work as a personal trainer at the Rush Fitness Complex ("the Rush"). She testified that on October 9, 2006, she began a second job as a physical therapist assistant at Fort Sanders Regional Hospital. She testified that her typical weekday involved training a client at the Rush at 6:00 a.m., returning home to dress for work, working at Fort Sanders Regional Hospital, returning home, training another client at the Rush from 6:00 to 9:00 p.m., and then returning home for bed. The victim lived on a ground-floor apartment in an apartment complex.

The victim testified that on October 22, 2006, the day before she was raped, she cleaned the house, washed dishes, and did laundry. She then shopped at Dick's Sporting Goods and went to eat with her friend, Jennifer Johnson. The victim testified that Ms. Johnson returned to her apartment with her and stayed until approximately 9:30 p.m. After Ms. Johnson left, the victim washed her face, brushed her teeth, removed her contact lenses, and changed into a tank top and boxer shorts. The victim testified that she set her mobile telephone on her bedside table and went to sleep around 10:45 p.m. She explained that she did not have a client from the Rush scheduled for the next morning, so she had planned to go straight to the hospital.

The victim testified that she was awakened "[b]y a man's voice and a towel over [her] face." She said the man called her by her name and instructed her not to scream. The victim testified, "He then said that he had a knife, and he held it to my neck and asked if I could feel it, which I could." She said that the man told her that he had her driver's license and social security card and that he would kill her if she contacted the police. She said that the assailant called her a "stupid bitch" for leaving a window open. The victim said, "He asked me to roll over, which I did, and I was crying at this point and asking him please

---

[1]It is the policy of this court to refer to the victim's of sexual offenses by their initials.

not to do anything to me. At which point he said he wasn't going to f*** me and rolled me back over and began to touch me."

The victim stated that the defendant placed his fingers inside her vagina and that it hurt her. She told her assailant that he was hurting her, but he did not stop. The victim said that the assailant also performed oral sex on her and kissed both of her breasts. She testified that the man "straddled" her and attempted to force her to perform fellatio on him but that she refused. She testified that the man then got off her and asked where she kept her condoms. She testified that she told him that she did not have any and that the man then masturbated, ejaculating into the corner of the towel that covered her face.

The victim said the man then turned on the lights, told her that he had dropped his lighter, and commented that the victim had "a beautiful body." She testified that she tried to peek from beneath the towel during this time and that she saw a balding white man. The man then used something to "wipe down" the headboard of the victim's bed. The victim said that the man then told her to lift the fitted sheet from her bed and that she complied. He then pushed her into another room and took the towel from her face while shutting the door. She testified that he instructed her to stay in the room for 30 minutes.

The victim testified that she realized that she was in the bathroom when she stepped in her cats' litter box. She waited until she no longer heard any noises, and then she retrieved a knife from the kitchen and turned on all her lights. She called Ms. Johnson via her mobile telephone and, after Ms. Johnson arrived, she called the police.

The victim described the assailant as having a "very southern accent." The victim "thought [she] caught a glimpse of just the top of his head." She said, "[I] opened my eyes, and I see not much hair, if any, and then the towel went completely over my face." She testified that she could feel that the assailant wore denim jeans and that he had a "very rough face." The victim also "heard" his belt buckle. She testified that his shirt was cotton and that it had a chest pocket because he stated his lighter fell out of his shirt. She believed that the assailant used his shirt to wipe down the headboard. She said that the assailant weighed approximately 190 pounds and had a "beer belly."

The victim maintained that, with the exception of her obtaining her mobile telephone from her night stand, she did not disturb any possible evidence in her bedroom. The victim testified that she observed a muddy footprint by a window in a guest bedroom of her apartment that was not there when she cleaned the apartment earlier. She also found a "jumbled mass of hair" on her hand, which she placed in a plastic bag and gave to law enforcement officers. She stated that the hairs included long and shorts hairs and that some were blond and some were darker.

The victim said that, after law enforcement officers arrived, she followed an officer to Safe Haven where she gave a statement to the attending nurses and law enforcement officers. She testified that the assailant had no permission to touch her sexually.

On cross-examination, the victim stated that the assailant did not wear gloves and that she did not believe an additional assailant was in her apartment. She admitted that she could not recall if the assailant held the knife to her during the digital rape. She also said that the assailant smelled strongly of cigarette smoke.

Deputy Angela Renee Varner of the Knox County Sheriff's Office ("KCSO") testified that she responded to the victim's 9-1-1 call. She observed the victim's bedroom and bed linens "all messed up and everything." She also observed a footprint in the victim's guest bedroom. Deputy Varner photographed the apartment and bedroom. She also attempted to lift fingerprints from the bedside lamp and headboard, but she found no useable prints. Deputy Varner also collected a note that read, "Hi. I'm shy and would love to meet you. Please write at www.akandyktn@yahoo.com; P.S., for a good time."

Anthony Dwayne Winston testified that he worked as the associate technical director in the forensic identity department of Laboratory Corporation of America in North Carolina. The court qualified him as an expert in deoxyribonucleic acid ("DNA") analysis. He testified that he tested the darker hairs from the bundle of hair found by the victim; however, he did not have sufficient amounts of the darker hair to yield a DNA profile. On cross-examination, he explained that he only received instructions to test the darker hairs and not the blond hairs.

Deborah Harrington testified that she worked at the Safe Haven Center in Knoxville in 2006 as a sexual assault examiner. She testified that she was the coordinator for continuing education for health sciences at Roane State Community College and had spent 30 years as a nurse and paramedic. Ms. Harrington testified that she and KCSO officers interviewed the victim for approximately an hour on October 23, 2006. She said that the victim told her what happened to her and that she used this information in performing the sexual assault examination.

Ms. Harrington testified that she performed a "head-to-toe" external examination of the victim to identify any visible injuries. She testified that she did not observe any external injuries but that this was consistent with the victim's statement. She then examined the external genitalia of the victim and observed redness on the "lower borders" of the vagina and that the victim reported tenderness in the area. Ms. Harrington also observed an area of the victim's vagina that was "actually abraded, which means epithelial cells had actually been rubbed off the area." She swabbed the area which revealed

that the abrasion was bleeding. She stated that these injuries were consistent with the victim's interview.

The assistant district attorney general asked whether the injuries that Ms. Harrington observed on the external area of the victim's vagina "would be consistent with an individual sticking two fingers roughly, forcefully in [the victim's] vagina and causing those injuries," and Ms. Harrington responded that the injuries were consistent with the assistant district attorney general's description.

Ms. Harrington also performed a "lighted speculum exam" to view the cervix and the vaginal vault. She noted reddened and abraded areas and that the victim "complain[ed] of tenderness on palpation of those particular areas." She testified that she observed another small cut during this exam.

Ms. Harrington testified that she also took swabs from the victim's vagina, mouth, and breasts for later DNA analysis.

On cross-examination, she agreed that redness in the vaginal area can be caused by rashes and "inflammatory reactions." She also admitted that she had not reviewed the victim's medical history and did not know whether she suffered from any conditions that would produce such rashes or reactions. Ms. Harrington noted, however, that "any kind of infection or inflammatory process is basically a generalized type of process, as opposed to just an isolated spot or two," and she maintained that the medical history would have had "very little" affect on her examination of the victim.

Miles Bradford Park of the KCSO's forensic services division testified that he assisted Deputy Varner in photographing and fingerprinting the victim's bedroom after the attack. He also fingerprinted the outside and inside of the window where the assailant entered and the sliding glass door where he possibly left. He testified that he was unable to lift any useable prints. Deputy Park testified that he noticed a screen lying flat against the outside wall of the apartment. He also took a plaster cast of a footprint found outside. He also measured the footprint inside the apartment and noted it was approximately 11 or 12 inches in length. On cross-examination, Deputy Park admitted that nothing in his investigation suggested that any part of the scene had been wiped down.

Deputy Michael McMahan of the KCSO testified that detectives on the victim's case called him and asked him to collect a condom and a hand towel from the victim's apartment complex. Detective Brad Hall testified that the items were found around the apartment complex's dumpster.

Janice Lyons testified that she worked at a private forensic company called Bode Technologies in Lorton, Virginia, when she analyzed the swabs from the victim's sexual assault kit as well as the towel and condom. She testified that she was also provided with a known blood standard from the victim.

Ms. Lyons testified that the breast swabs indicated the presence of saliva and that she developed a DNA profile of a male contributor. She also found the presence of semen on the corner of the towel and on the inside of the condom. She developed a DNA profile for the semen samples and discovered they were from the same male contributor; however, the contributor to the towel and condom was different from the contributor to the breast swabs. Ms. Lyons then returned the results of her testing to the Tennessee Bureau of Investigation ("TBI").

Special Agent Jennifer Milsaps of TBI's Knoxville Regional Crime Laboratory testified that she received the DNA profiles from Ms. Lyons at Bode Laboratories. She stated that she entered the DNA profiles into the Combined DNA Index System ("CODIS") to determine the identity of the contributors. Agent Milsaps testified that CODIS returned the defendant's name as the contributor of the saliva on the breast swabs. She stated that CODIS returned no match for the contributor of the semen on the towel and condom.

Lisa Wessner of the TBI testified as an expert in serology and DNA analysis. She testified that she generated a DNA profile from the defendant's buccal swab. She testified that the defendant's DNA profile matched the profile taken from the swab of the victim's breasts. She testified that the DNA profiles matched to the exclusion of the world's population. On cross-examination, she stated that she also examined whether the defendant's DNA matched the profile on the towel and that it did not match.

Detective Hall testified that he obtained a presentment against the defendant and that he went to the defendant's mobile home to arrest him on February 20, 2008. He recalled that when he arrived at the defendant's mobile home and saw no cars or people at the home, he then went to the front of the trailer park to wait for the defendant to return home. Detective Hall then followed the defendant's vehicle to his home and observed the defendant park his car and enter his home.

Detective Hall testified that two officers assisted him in arresting the defendant and that he and one officer went to the front door while the third officer went to the back door. The officers knocked and announced their presence but received no answer from the front or back door. Detective Hall testified that he then forced entry into the home and that the defendant appeared from the rear of the trailer holding a handgun. He said the defendant yelled, "Who are you? What are you doing in here? What do you want? Get out?" He said

that the defendant had the gun pointed toward the officers with his other hand "on top of it" racking the slide. The defendant then retreated to the back of the mobile home. Detective Hall testified that the officers set up a perimeter around the home so that the defendant could not escape and that the special weapons and tactics ("SWAT") team arrived. The defendant spoke with his sister via his telephone, and he informed the officers that "if his sister could come down closer to the trailer to where he could see her" he would exit the home. The officers complied, and the defendant exited the mobile home and was arrested. The State played an audio-recording of these events that were captured by a recording device held by Detective Hall.

Detective Hall said that the officers then searched the residence and found ashtrays, cigarette lighters, and a pack of cigarettes. Detective Hall also found a knife in the residence. The officers found a pair of the defendant's boots, which were men's size 10.5 and approximately 12 inches in length. Detective Hall testified that the defendant had brown hair and weighed approximately 200 pounds. He said that they recovered a loaded handgun.

On cross-examination, Detective Hall admitted that the defendant voluntarily came to the KCSO for a buccal swab on February 8, 2008. He also admitted that the defendant voluntarily reported to the office for questioning. Detective Hall read the defendant his rights, the defendant spoke with him for some time, and then the defendant stopped and asked for his attorney.

The State rested, and the defendant called Charles Price of the KCSO who helped Detective Hall in arresting the defendant. He stated that the defendant did not point the gun directly at the officers; however, he maintained that the defendant pointed the gun in the officers' direction.

Joan Cannon, the defendant's sister, testified that the defendant had lived with her for six of the previous eight years. She maintained that the defendant never smoked cigarettes and that he only smoked marijuana. She testified that she was a smoker and that the defendant allowed her to smoke while at his home and that he had other friends that smoked cigarettes. She testified that the defendant did not wear belts because he had an allergy to the metal in the buckles. She also testified that, although the defendant kept his hair shaved, his hair was blond. She produced a photograph showing the defendant with blond hair. On cross-examination, she admitted that the photograph of the defendant was from 1966 and that his hair was "not that blond of a blond" anymore.

Based upon the evidence as summarized above, the jury convicted the defendant of two counts of aggravated rape and two counts of aggravated sexual battery.

*Sentencing Hearing*

During the sentencing hearing, the State called Sam Brown of the Knoxville Police Department, who testified that while on patrol in 1993, he received a complaint from a woman named Kimberly Cline. He said that Ms. Cline reported that "there was an individual that was peeping in her windows and breaking in her car and doing stuff like that." He said that he and another officer followed Ms. Cline as part of a "direct patrol" and observed the defendant following Ms. Cline on the campus of the University of Tennessee. They discovered he had broken into Ms. Cline's vehicle and left a rose and taken papers. On cross-examination, Officer Brown testified that he interviewed the defendant, who admitted to breaking into Ms. Cline's vehicle and pleaded guilty.

Shayne Cooper testified that he was employed in the Knoxville Police Department in 1997 and received a complaint about a "Peeping Tom" at an apartment complex who was videotaping several young females. Mr. Cooper and other officers monitored the apartment complex one night and observed the defendant. The officers then arrested the defendant after a struggle which involved the officers' deploying pepper spray. The defendant had possession of "a set of handcuffs, a Halloween mask, a stun gun, a screw driver, a hair net, and surgical gloves." Mr. Cooper stated that he found videotaping equipment in the defendant's vehicle. On cross-examination, Mr. Cooper noted that the defendant pleaded guilty. He also testified that the defendant was using a screwdriver and attempting to pry open a window when the officers apprehended him. He admitted that the officers did not charge the defendant with any sex-related offenses for this incident. On redirect-examination, Mr. Cooper testified that a young lady was inside the apartment to which the defendant had tried to obtain entry.

The victim testified that, as a result of the defendant's attacking her, she lived in fear. She testified that she had moved twice since the incident. She said that she had been to therapy and taken medications but that nothing "will . . . ever take that away from me." She said, "I will be living with this for the rest of my life . . . ."

The State exhibited several judgments of conviction including convictions of receiving stolen property and possession of methqualone and marijuana in 1980; sale of marijuana in 1983; and assault and attempted aggravated burglary in 1999. The prosecution also introduced a federal conviction of felon in possession of a firearm resulting from the defendant's arrest in the instant case. The presentence report reflected a 1993 conviction of aggravated criminal trespass and a 1992 conviction of disorderly conduct.

The defense called Ms. Cannon, who explained that the defendant had "a real messed up home life" and that his father was abusive. She testified that the defendant's

mother was not kind to him either and that his parents forced him to live in a shed outside when he was 13 years old. She testified that the defendant had a "real good heart." She described the defendant as a hard worker and testified that he lived with her and her husband while on parole and that he complied with the conditions of his parole. Ms. Cannon testified that the defendant's son died at the age of 26 in a car accident in 2006. She said the two were close and had worked together at a concrete surfacing company.

Ms. Cannon testified that the defendant called her the day that Detective Hall and other officers tried to arrest him. She said that the defendant told her that he attempted to shoot himself but the gun malfunctioned. She said that she went to the scene and helped talk the defendant out of the mobile home. She testified that the defendant had no intention of running from the police or else he would have fled to Mexico where he had relatives. She also said the defendant was fluent in Spanish. Ms. Cannon testified that the defendant wanted her to be at the scene before his arrest because he had been beaten by police in the past.

The State asked for the maximum sentence for the aggravated rape and the aggravated sexual battery convictions. The State argued that the defendant was a dangerous offender and that his sentences should run consecutively. The prosecutor also argued as an enhancement factor the defendant's criminal conviction history and that his admitted history of drug use showed a pattern of prior criminal behavior. The State also noted that the defendant had violated his community-based sentence from his 1980 convictions.

The trial court determined that the defendant had a significant previous criminal history that included incidents in 1993 and 1997 when he stalked young women. It found that the defendant "had problems while he was on release" but considered it "not a major factor."

The trial court ordered the defendant to serve 25 years as a Range I offender at 100 percent for both aggravated rape convictions and 20 years as a Range II offender at 100 percent for both aggravated sexual battery convictions. The court ordered the rape sentences to run concurrently to each other and for the aggravated sexual battery convictions to run concurrently to each other, but it ordered the aggravated sexual battery sentences to run consecutively to the rape sentences for an effective sentence of 45 years.

*Issues on Appeal*

The defendant presents four issues on appeal. The defendant challenges the sufficiency of the convicting evidence. The defendant also argues that the trial court erred by instructing the jury on "flight" and that it erred in admitting Ms. Harrington as an expert.

Lastly, the defendant challenges his sentence, arguing that the trial court erred in ordering him to serve the maximum available sentence.

## I. Sufficiency of the Evidence

The defendant argues that the evidence weighed against the jury's verdict of guilty. He does not contend that the State failed to establish the elements of the crimes of aggravated rape or aggravated sexual battery, but he challenges the jury's finding that he was the assailant that attacked the victim. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant argues primarily that inconsistences between the victim's description of the assailant and Ms. Cannon's description of the defendant undermine the State's case. We disagree. The victim described a balding, 190-pound male who "reeked" of cigarette smoke as her attacker. Detective Hall testified that the defendant was 200 pounds and bald and that the defendant's home contained ashtrays filled with burned cigarettes. Further, the defendant's boots retrieved from his home matched the length of the muddy boot-print found in the victim's guest bedroom. The jury clearly did not credit Ms. Cannon's description of the defendant and credited the State's evidence.

Lastly, the victim testified that the assailant placed his mouth on her breasts. Swabs taken from her breasts contained saliva with a DNA profile matching the defendant to the exclusion of the world population. This direct evidence clearly places the defendant at the scene of the crime and proves his identity as the rapist.

-10-

The defendant also claims that the fact that the DNA found on the towel recovered from the dumpster of the apartment complex did not belong to him exonerates him. However, aside from being found in a dumpster in the same apartment complex, no evidence suggested that this towel was the one used to cover the victim's face. Further, the towel was found with a condom containing the same unknown DNA profile, and the victim specifically testified that neither she nor the assailant possessed a condom.

## II. Jury Instructions

The defendant next challenges the court's instructing the jury on "flight." The defendant contends that the trial court erred by instructing the jury on flight and the inference of guilt that may be justified from such flight. The State argues that the instruction was proper.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see* Tenn. R. Crim. P. 30. To properly charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970) (citing 22A C.J.S. Criminal Law § 625))). Our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

The trial court explained during the motion for new trial hearing that its instruction on flight was appropriate because the defendant had spoken with the police approximately 12 days before the officers came to arrest him and that despite the officers' announcement when knocking on the door, he refused to allow them entry to his home. The trial court noted that when the officers eventually entered the home, the defendant displayed a gun which resulted in a lengthy stand-off. The trial court considered this evidence sufficient to support a flight instruction.

We recognize the defendant's concern that a flight instruction was given despite the defendant's initial cooperation with law enforcement personnel and the fact that he never "concealed" himself. However, the record clearly establishes that the defendant left the scene of the crime, and perhaps more importantly, ran from the police upon their arriving to take him into custody. He fled to another area of the house where he holed-up, armed, for an extended period of time. In our view, this behavior satisfies the requirements of "leaving,

-11-

evading, and concealing."

Moreover, it is our view that any error occasioned by the giving of the flight instruction in this case was harmless. The United States Supreme Court and, to some extent, the supreme court of this state have examined jury instruction errors on a continuum of error, finding some errors so profound as to defy harmless error analysis while finding some more akin to other garden variety trial errors. At the beginning of this continuum, we find the complete deprivation of a public jury trial, which has been deemed structural error not subject to harmless error analysis. *See Waller v. Georgia*, 467 U.S. 39, 49 (1984). Similarly, some jury instruction error, error which strikes at the very heart of an accused's right to trial by jury and which "categorically vitiat[es] all the jury's findings," *Hedgpeth v. Pulido*, — U.S. —, 129 S. Ct. 530, 532 (2008) (citations and internal quotation marks omitted), is also structural error. *See Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). In *Sullivan*, the Court determined that "where the instructional error consists of a misdescription of the burden of proof, which *vitiates* all the jury's findings," the error was not subject to harmless error analysis because "[a] reviewing court can only engage in pure speculation -- its view of what a reasonable jury would have done."[2] *Id.* Structural errors "'defy analysis by 'harmless-error' standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)). "But 'structural errors' are 'a very limited class' of errors that affect the 'framework within which the trial proceeds,' such that it is often 'difficul[t]' to 'asses[s]' the effect of the error." *United States v. Marcus*, No. 08-1341, 2010 U.S. LEXIS 4163, at *10-11 (May 24, 2010) (citations omitted).

More common in the continuum are those jury instruction errors that do not equate to a complete deprivation of the right to trial by jury but nevertheless seriously implicate both the right to trial by jury and, in many instances, the right to a fair trial, which

---

[2]The Court concluded that the erroneous reasonable doubt instruction given at Sullivan's trial violated both the Sixth Amendment jury trial right as well as the Fifth Amendment guarantee of due process:

> It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.

*Sullivan*, 508 U.S. at 278.

is a component of constitutional due process. *See Hedgpeth*, — U.S. —, 129 S. Ct. at 532 (observing that "various forms of instructional error are not structural but instead trial errors subject to harmless-error review"). In *Hedgpeth*, the Court observed that the omission of an element of an offense, *see Neder v. United States*, 527 U.S. 1 (1999), the giving of an erroneous aider and abettor instruction, *see California v. Roy*, 519 U.S. 2 (1996), the misstatement of an element of an offense, *see Pope v. Illinois*, 481 U.S. 497 (1987), and the erroneous burden-shifting as to an element of an offense, *see Rose v. Clark*, 478 U.S. 570 (1986), had all been subjected to constitutional harmless error analysis. *See Hedgpeth*, — U.S. —, 129 S. Ct. at 532. Errors in this category require reversal unless the error can be deemed "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). "Indeed, [the Court has] said that 'if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred' are not 'structural errors.'" *Marcus*, 2010 U.S. LEXIS 4163, at *14 (quoting *Rose*, 478 U.S. at 579). These errors "'occur[] during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.' These include 'most constitutional errors.'" *Gonzalez-Lopez*, 548 U.S. at 148-49 (quoting *Fulminante*, 499 U.S. at 306-08). When considering this category of error, a reviewing court "should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth*, — U.S. —, 129 S. Ct. at 531 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted in original)). As the Court explained,

> Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

*Sullivan*, 508 U.S. at 279 (citations omitted).

At the far end of the continuum are those instructional errors that do not rise to the level of a deprivation of either the right to trial by jury or constitutional due process.

"The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" *Rivera v. Illinois*, — U.S. —, 129 S. Ct. 1446, 1454 (2009) (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)). The Court recognized that "errors of state law do not automatically become violations of due process," particularly where "there is no suggestion . . . that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner." *Rivera*, — U.S. —, 129 S. Ct. at 1455 (citations omitted). It is into this latter category that the instruction on flight fits. The trial court should not give the flight instruction if it is unsupported by the evidence; however, we cannot say that the erroneous giving of the instruction in a case where the jury is otherwise properly instructed and impartial either vitiates the jury's verdict or otherwise seriously implicates either the defendant's right to trial by jury or to due process. Rather, the error, like many others, is thus subject to a traditional harmless error analysis. That being said, it is our view that the instruction in this case, even if erroneous, was harmless given the overwhelming proof of the defendant's guilt.

### III. Expert Witness

The defendant next argues that the trial court erred in admitting Ms. Harrington, the nurse practitioner, as an expert witness.

The assistant district attorney general asked whether the injuries were consistent "with an individual sticking his fingers" in the victim's vagina, and defense counsel objected, arguing that Ms. Harrington was not an expert and was not qualified to answer such a question. The trial court opined that she qualified as an expert and asked whether defense counsel wanted to voir dire the witness. Defense counsel responded, "Probably not, your Honor."

During Ms. Harrington's testimony, the assistant district attorney general asked Ms. Harrington about her educational background. Ms. Harrington stated that she graduated from the Baptist Hospital School of Nursing and spent 15 years in critical care. She then spent seven years performing gynecological examinations and "a couple of years" of labor and delivery. The State offered Ms. Harrington as an expert; however, the trial court stopped the assistant district attorney general before she could specify Ms. Harrington's proffered area of expertise.

Defense counsel then conducted a voir dire examination, and Ms. Harrington testified that she had taken a 40-hour course on sexual assault examinations through Safe Haven Center and the University of Tennessee College of Nursing. She also had clinical training and had been "involved [in the Safe Haven Center] clinically for several months

prior to this case." She testified that she received a certificate for her training from the University of Tennessee College of Nursing in 2006.

The trial court then allowed the assistant district attorney general to ask whether the injuries that Ms. Harrington observed on the external area of the victim's vagina "would be consistent with an individual sticking two fingers roughly, forcefully in [the victim's] vagina and causing those injuries." Ms. Harrington responded that the injuries were consistent with the assistant district attorney general's description. The court never made a specific finding that Ms. Harrington was an expert, and Ms. Harrington never testified that her opinion dwelled within a reasonable degree of medical certainty. *See e.g.*, *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993); *State v. James Clayton Young*, No. 01C01-9605-CC-00208 (Tenn. Crim. App., Nashville, May 22, 1998).

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

In the instant case, the trial court never actually stated that Ms. Harrington was an expert, but we infer it determined she was qualified to give an opinion on whether the victim's vaginal injuries were consistent with forced, digital rape. Nevertheless, the record shows that Ms. Harrington had 30 years' experience as a nurse with 7 years' specifically relating to gynecological care. She had specific training and clinical experience dealing with sexual assault, and her opinion that the victim's injuries were consistent with "an individual sticking two fingers roughly, forcefully in [the victim's] vagina" certainly lies within her realm of expertise. We discern no abuse of discretion in admitting this opinion evidence.

*IV. Sentencing*

Lastly, the defendant argues that the trial court erred by ordering the defendant to serve the maximum sentence. When considering a challenge to the length of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2003). Our case law has long held that the

presumption of correctness "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Carter*, 254 S.W.3d at 344; *Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

Our review of the record shows that the trial court carefully considered all relevant factors in sentencing the defendant, and our review is de novo with a presumption that the trial court's sentence was correct. *See Ashby*, 823 S.W.2d at 169. The trial court correctly noted that the defendant had an extensive criminal record that exceeded that necessary for his Range I and Range II sentences. *See* T.C.A. § 40-35-114(1) (allowing sentence enhancement on the basis that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). Further, the trial court noted that two of the defendant's prior convictions also involved similar instances of stalking young women. *See id.* § 40-35-103(5) ("The potential or lack of potential for the rehabilitation . . . should be considered in determining the . . . length of a term to be imposed."). The record, therefore, is sufficient to support the trial court's ordering of the maximum available sentences.

## *V. Merger*

The State's brief suggests that the defendant's convictions resulted from one criminal action for each type of offense and that therefore his convictions should be merged to reflect one conviction of aggravated rape and one conviction of aggravated sexual battery. We agree. As a matter of plain error, see Tenn. R. App. P. 36(b); *State v. Lewis*, 958 S.W.2d 736, 738 (Tenn. 1997), we hold that principles of double jeopardy bar the defendant's multiple convictions of aggravated sexual battery and his multiple convictions of aggravated rape. The defendant was indicted on two alternate theories of aggravated sexual battery and aggravated rape. Under one theory, the indictment alleged that the defendant caused bodily injury during the offenses, and, under the other theory, the indictment alleged the use of a deadly weapon to facilitate the commission of the offenses. According to the bill of particulars, the State only alleged one instance of aggravated rape (digital penetration of the

vagina) and one instance of aggravated sexual battery (the defendant's placing the victim's breasts in his mouth). The trial court should have merged the verdicts into one conviction of aggravated rape and one conviction of aggravated sexual battery. *See State v. Billy Harris,* No. W2003-01911-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Aug. 4, 2004) (noting that a merger of convictions is appropriate to protect against double jeopardy when jury convicts a defendant under alternate theories of same offense).

To effect merger, the proper procedure is to merge the findings of guilt of aggravated rape into one conviction judgment and of aggravated sexual battery into another conviction judgment. *See State v. Timmy Reagan*, No. M2002-01472-CCA-R3-CD, slip op. at 20 (Tenn. Crim. App., Nashville, May 19, 2004) ("[N]either two sentences nor separate judgments of conviction should [be] entered, and the one judgment of conviction should reflect the merger."). On remand, the trial court should vacate the judgments of conviction for the alternative counts and amend the judgments for each count to reflect the merger.

*Conclusion*

The convicting evidence supports the defendant's convictions; however, we remand to the trial court to enter judgments reflecting merger of alternate counts of aggravated sexual battery and aggravated rape. Further, we hold that the trial court did not commit reversible error in instructing the jury on flight and qualifying Ms. Harrington as an expert. Lastly, we do not disturb the sentences ordered by the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE